**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

DANIEL KUUALOHA AUKAI,
*Defendant-Appellant.*

No. 04-10226

D.C. No.
CR-03-00062-1-HG

OPINION

Appeal from the United States District Court
for the District of Hawaii
Helen Gillmor, District Judge, Presiding

Argued and Submitted
May 11, 2005—Honolulu, Hawaii

Filed March 17, 2006

Before: Dorothy W. Nelson, Consuelo M. Callahan, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

---

## SUMMARY

---

### Criminal Law and Procedure/Search and Seizure

The court of appeals affirmed a judgment of the district court. The court held that a prospective commercial airline passenger, who presented no identification at check-in, and who voluntarily walked through a metal detector without setting off an alarm, cannot then prevent a government-ordered secondary screening search by stating he has decided not to fly and wants to leave the terminal.

2838        UNITED STATES V. AUKAI

Appellant Daniel Aukai arrived at the Honolulu Interna-
tional Airport intending to fly to Kona, Hawaii. Aukai pre-
sented no identification at check-in, was given a boarding
pass marked "No ID," and voluntarily walked through a metal
detector or "magnetometer" without setting off an alarm. Pur-
suant to Transportation Security Administration (TSA) proce-
dures, a passenger who presents a boarding pass on which
"No ID" has been written is subject to secondary screening
even if he or she has passed through the initial screening with-
out triggering an alarm or otherwise raising suspicion. Aukai
was subjected to a secondary screening by a TSA officer
using a handheld magnetometer wand. The wand alarm was
triggered at Aukai's front right pants pocket. Aukai repeatedly
refused officers' directions to empty his pocket. He finally
removed an object wrapped in paper officers thought might be
a weapon. An officer unwrapped it and discovered a pipe used
to smoke methamphetamine. Aukai was placed under arrest
and during a search incident to his arrest, the police discov-
ered bags in his pockets, which Aukai admitted contained
methamphetamine. Aukai was charged in district court with
drug possession and distribution crimes. After unsuccessfully
moving to suppress the evidence found incident to his arrest
at the airport and his statement, Aukai pleaded guilty preserv-
ing his right to appeal the denial of his suppression motion.
The district court sentenced Aukai to 70 months in prison.

Aukai appealed, arguing that following his implied consent
to the initial screening, he elected not to fly rather than
undergo the secondary screening and, thereby, revoked his
implied consent.

[1] The Ninth Circuit has held that, as administrative
searches, airport security screenings are permissible under the
Fourth Amendment though not supported by a showing of
probable cause directed to a particular place or person, if,
despite the absence of a warrant, they nonetheless meet the
Fourth Amendment's standard of reasonableness. The Ninth
Circuit has concluded that an airport security screening pro-

cess satisfies this reasonableness standard provided (1) that it is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives, (2) that it is confined in good faith to that purpose, and (3) that potential passengers may avoid the search by electing not to fly. [2] The Ninth Circuit has held that airport screening searches are valid only if they recognize the right of a person to avoid the search by electing not to board the aircraft. [3] However, the requirement of allowing passengers to avoid the search by electing not to fly does not extend to a passenger who has already submitted his luggage for an x-ray scan where the initial screening is inconclusive, and, thus, if a potential passenger wishes to avoid a secondary search in the event of an inconclusive initial screening, he must elect not to fly before placing his baggage on the x-ray machine's conveyor belt.

[4] The Ninth Circuit has held that a potential passenger irrevocably consents to a secondary screening when he voluntarily submits to an initial screening that is inconclusive as to the presence of weapons or explosives. The Ninth Circuit interpreted the term "inconclusive" broadly: an x-ray scan may be deemed inconclusive, justifying further search, even when it does not affirmatively reveal anything suspicious. Therefore, even when a secondary screening is triggered solely as part of a systemized random search policy—the initial screening doesn't affirmatively reveal anything suspicious—the initial screening prohibits the potential passenger from revoking his implied consent for the secondary screening if there still is a chance the passenger may be carrying as-yet-undetected weapons or explosives. In other words, the inconclusive nature of a proper initial screening, by itself, establishes that the potential passenger has impliedly consented to a secondary screening.

[5] It had to be concluded that the secondary screening at issue here was most akin to that which the Ninth Circuit has held reasonable. The contested search occurred at the security

checkpoint, but after the prospective passenger had voluntarily passed through initial screening, which, although it did not affirmatively reveal anything suspicious, was nonetheless inconclusive insofar as it did not rule out every possibility of dangerous contents. It had to be held that Aukai impliedly consented to a secondary search of his person by walking through the magnetometer, and that he could not subsequently revoke his consent to the secondary screening.

[6] Nothing about the definition of "inconclusive" is necessarily limited to x-ray scans as opposed to magnetometers. There was no reason to consider Aukai's magnetometer search any more conclusive than the x-ray scan. It had to be held that, for the purposes of the implied consent inquiry, the screening by the walkthrough magnetometer did not rule out every possibility of dangerous contents and was therefore inconclusive. [7] The methods used were minimally intrusive to Aukai's privacy in light of his repeated non-cooperation. The fact that Aukai's person was searched, rather than his baggage, provided no basis for distinguishing the rule that implied consent to an inconclusive initial search cannot be revoked prior to a secondary search at a contemporary airport screening station. The judgment of the district court had to be affirmed.

---

## COUNSEL

Edward H. Kubo, Jr., United States Attorney for the District of Hawaii, and Thomas J. Brady, Assistant United States Attorney for the District of Hawaii, for plaintiff-appellee the United States of America.

Pamela O'Leary Tower, Honolulu, Hawaii, for defendant-appellant Daniel Kuualoha Aukai.

## OPINION

BEA, Circuit Judge:

We must decide whether a prospective commercial airline passenger, who presented no identification at check-in, and who voluntarily walked through a metal detector without setting off an alarm, can then prevent a government-ordered secondary screening search by stating he has decided not to fly and wants to leave the terminal. We hold that such passenger cannot prevent the secondary search because such search comports with the Fourth Amendment's requirement that a search be reasonable where, as here, the initial screening was "inconclusive" as defined in *United States* v. *Torbet*, 298 F.3d 1087, 1089-90 (9th Cir. 2002). We need not and therefore do not decide whether the same would be true were the secondary screening more intrusive or were it triggered by the subjective evaluation of the prospective passenger by airline or security personnel rather than more objective criteria such as a screening machine alarm being triggered, random selection, or, as here, the prospective passenger's failure to present identification upon checking in.

### I.

### A.

On February 1, 2003, Defendant-Appellant Daniel Kuualoha Aukai arrived at the Honolulu International Airport intending to take a Hawaiian Airlines flight from Honolulu, Hawaii to Kona, Hawaii. He proceeded to check in at the ticket counter, but did not produce a government-issued picture identification. Accordingly, the ticket agent wrote the phrase "No ID" on Aukai's boarding pass.

Aukai then proceeded to the security checkpoint, where signs were posted advising prospective passengers that they and their carry-on baggage were subject to search. He entered

the security checkpoint at approximately 9:00 a.m., placed his shoes and a few other items into a plastic bin, and then voluntarily walked through the metal detector or magnetometer. The parties agree that the magnetometer did not signal the presence of metal as Aukai walked through it. Nor did his belongings trigger an alarm or otherwise raise suspicion as they passed through the x-ray machine. After walking through the magnetometer, Aukai presented his boarding pass to Transportation Security Administration ("TSA") Officer Corrine Motonaga.

Pursuant to TSA procedures, a passenger who presents a boarding pass on which "No ID" has been written is subject to secondary screening even if he or she has passed through the initial screening without triggering an alarm or otherwise raising suspicion. As it was performed here, secondary screening consists of a TSA officer passing a handheld magnetometer, known as a "wand," near and around the passenger's body. If the wand detects metal, it sounds an alarm. The TSA officer then discerns the cause of the alarm, using techniques such as feeling the outside of the passenger's clothes in the area that caused the alarm and, if that area is near a pocket, directing the passenger to empty his pocket.

Because Aukai's boarding pass had the "No ID" notation, Motonaga directed Aukai to a nearby, roped-off area for secondary screening. Aukai initially complied, but complained that he was in a hurry to catch his flight, which, according to the boarding pass, was scheduled to leave at 9:05 a.m. Although Aukai went to the roped-off area as directed, he did not stay there. When Motonaga noticed that Aukai had left the area and was gathering his belongings from the plastic bin, she instructed Aukai that he was not allowed to retrieve his property and that he had to stay in the roped-off area.

Aukai then appealed to TSA Officer Andrew Misajon, who was to perform the secondary screening, explaining again that he was in a hurry to catch his flight. Misajon nonetheless had

Aukai sit in a chair, and thereafter proceeded to use the wand to detect metal objects. At some point, Misajon had Aukai stand, and when Misajon passed the wand across the front of Aukai's body, the wand alarm was triggered at Aukai's front right pants pocket. Misajon asked Aukai if he had anything in his pocket, and Aukai responded that he did not. Misajon passed the wand over the pocket a second time; again the wand alarm was triggered. Misajon again inquired whether Aukai had anything in his pocket; again Aukai said he did not. Misajon then felt the outside of Aukai's pocket and concluded that something was inside the pocket. Misajon could also see the outline of an unknown object in Aukai's pocket. At some point during this screening process, Aukai informed Misajon that he wanted to leave the airport.

At this point, TSA Supervisor Joseph Vizcarra approached Misajon and asked whether he needed assistance. Misajon related the events; Vizcarra asked Misajon to pass the wand over Aukai's pocket again. When the wand alarm again was triggered, Vizcarra directed Aukai to empty his pocket. Aukai again protested that he had nothing in his pocket. Using the back of his hand, Vizcarra touched the outside of Aukai's pocket and felt something in the pocket. He again directed Aukai to empty his pocket. This time Aukai reached into his pocket and removed either his keys or change, but a bulge was still visible in his pocket. Vizcarra directed Aukai to remove all contents from his pocket. After claiming at first that there was nothing more, Aukai finally removed an object wrapped in some form of tissue paper and placed it on a tray in front of him.

Suspecting that the item might be a weapon, Vizcarra summoned a nearby law enforcement officer. Vizcarra then unwrapped it and discovered a glass pipe used to smoke methamphetamine. The law enforcement officer took control and escorted Aukai to a small office near the security checkpoint. Aukai was placed under arrest and was searched incident to his arrest. During the search, the police discovered in

Aukai's front pants pockets several transparent bags containing a white crystal substance. Aukai eventually was taken into federal custody, where he was advised of and waived his *Miranda* rights, and then gave a statement in which he inculpated himself in the possession of methamphetamine.

### B.

Five days later, Aukai was indicted for knowingly and intentionally possessing, with the intent to distribute, 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A)(viii). Aukai filed a motion to suppress the evidence found incident to his arrest at the airport and the statement he later made, which motion the district court denied. Aukai then pleaded guilty pursuant to a written plea agreement that preserved his right to appeal the denial of his suppression motion. The district court sentenced Aukai to a term of imprisonment of 70 months and a term of supervised release of 5 years, and Aukai timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm Aukai's conviction.

### II.

We review de novo the district court's legal basis for denying a motion to suppress, but review the district court's findings of fact for clear error. *United States* v. *Marquez*, 410 F.3d 612, 615 (9th Cir. 2005), *as amended by* 2005 WL 1661572 (9th Cir. July 18, 2005).

### III.

[1] Federal law mandates that commercial airlines must refuse to transport any prospective passengers who do not submit to a search of their persons and possessions for dangerous weapons, explosives and other destructive devices prior to boarding an aircraft. 49 U.S.C. § 44902. In *United*

*States* v. *Davis*, 482 F.2d 893 (9th Cir. 1973), we held that such "nationwide anti-hijacking program[s,] conceived, directed, and implemented by federal officials in cooperation with air carriers," are not "beyond the reach of the Fourth Amendment." *Id.* at 897. Nevertheless, we deemed these airport security screenings "administrative" searches to the extent that they are "conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings," "rather than as part of a criminal investigation to secure evidence of crime." *Id.* at 908. We held that, as "administrative" searches, airport security screenings are "permissible under the Fourth Amendment though not supported by a showing of probable cause directed to a particular place or person," *id.*, if, despite the absence of a warrant, they nonetheless "meet the Fourth Amendment's standard of reasonableness." *Id.* at 910. Finally, we concluded that an airport security screening process satisfies this reasonableness standard provided "[1] that [it] is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives, [2] that it is confined in good faith to that purpose, and [3] that potential passengers may avoid the search by electing not to fly." *Id.* at 913.

At issue here is only the third element of the *Davis* test: "[T]hat potential passengers may avoid the search by electing not to fly." *Id.* at 913; *accord id.* at 910-11 ("It follows that airport screening searches are valid only if they recognize the right of a person to avoid search by electing not to board the aircraft."); *id.* at 912 ("In sum, airport screening searches of the persons and immediate possessions of potential passengers for weapons and explosives are reasonable under the Fourth Amendment provided each prospective passenger retains the right to leave rather than submit to the search.").[1,]

---

[1]Aukai does not otherwise contest the lawfulness of the screening nor of his subsequent arrest and the search incident to that arrest. In particular,

[2] In this regard, Aukai does not contest that he impliedly con-

Aukai does not contend that his secondary screening violated either of the *Davis* test's two other necessary elements: that the screening was "no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives," and that it was "confined in good faith to that purpose."

Regarding the former element involving the intrusiveness of the screening, Aukai does not contest the fact that he was not wanded after he had removed his keys or change from his pocket and before being ordered to remove from his pocket whatever it was that caused the visible and palpable bulge. *See United States* v. *Pulido-Baquerizo*, 800 F.2d 899, 901-02 (9th Cir. 1986) (holding that "a visual inspection and limited hand search of luggage" that "is conducted in a manner which produces negligible social stigma" "involves only a slight privacy intrusion").

Regarding the latter element involving the screening's good faith limitation to its administrative purpose, Aukai does not contest that the screening was triggered by the objective criterion that he failed to present identification upon his checking in at the airport. Therefore, this opinion does not decide whether a secondary screening triggered solely by arbitrary and subjective criteria would be "confined in good faith to [detect the presence of weapons or explosives]," and hence, a reasonable search under the Fourth Amendment. *See United States* v. *Henry*, 615 F.2d 1223, 1228 (9th Cir. 1980) (reasoning that the non-discriminatory and objective nature of the airport screening in question supported a finding that the screening was "reasonable" apart and distinct from another necessary element of the *Davis* test that the passenger impliedly consented to the screening); *Davis*, 482 F.2d at 910, 911 & n.51 (reasoning that an airport search was similar to other administrative searches that did not require a warrant because it was " 'not subject to the discretion of the official in the field,' " but also requiring that passengers impliedly consent to such searches (quoting *Camara* v. *Municipal Court*, 387 U.S. 523, 532 (1967)).

[2] Although the third element of the *Davis* test speaks of "electing" not to fly rather than "consenting" to the search, we recognized in *Davis* that the two are opposite sides of the same coin:

> We have held that, as a matter of constitutional law, a prospective passenger has a choice: he may submit to a search of his person and immediate possessions as a condition to boarding; or he may turn around and leave. If he chooses to proceed, that choice, whether viewed as a relinquishment of an option to leave or an election to submit to the search, is essentially a "consent," granting the government a license to do what it would otherwise be barred from doing by the Fourth Amendment.

UNITED STATES v. AUKAI                2847

sented to the initial metal detector screening and that such screening complied with the third element of the *Davis* test.[3] Instead, he argues that the secondary screening violated the third element of the *Davis* test because, following his implied consent to the initial screening, he elected not to fly rather than undergo the secondary screening and, thereby, revoked his implied consent. As noted above, the district court found that Aukai informed Misajon that he wanted to leave the airport only "[a]t some point" during the secondary screening, but before the methamphetamine pipe was discovered. Indeed, the testimony from the hearing on Aukai's motion to suppress does not evince when Aukai declared his intent to leave the airport. Nevertheless, we assume, as Aukai represents and as the government concedes, that Aukai declared his election not to fly and his desire to leave the airport before the wanding procedure.[4] Our task, to which we now turn, is to determine whether that election was valid.

---

*Davis*, 482 F.2d at 913 (emphasis added); *accord Henry*, 615 F.2d at 1228 (9th Cir. 1980) ("We have interpreted *Davis* to require that the search be reasonable and that there be 'implied consent' by the person to be searched.") (citing *McMorris* v. *Alioto*, 567 F.2d 897, 900 (9th Cir. 1978)); *United States* v. *Homburg*, 546 F.2d 1350, 1352 (9th Cir. 1976) ("In [*Davis*], we held that the justification for warrantless screening searches is the implied consent of the passenger.").

[3]Nor could he. *See Marquez*, 410 F.3d at 617-18 ("In this case, Marquez checked in, went to the security checkpoint, waited in line, placed his bag on the x-ray scanner, proceeded through the walkthrough magnetometer, and allowed [the TSA officer] to begin screening his person with the hand-held magnetometer; he had ample opportunity to choose to forego air travel in order to avoid the screening."); *Davis*, 482 F.2d at 914 ("It may well be that under the present airport screening program, operating pursuant to current regulations, the alternatives presented to a potential passenger approaching the screening area are so self-evident that his election to attempt to board necessarily manifests acquiescence in the initiation of the screening process.").

[4]We note that after the wanding procedure began, Aukai claimed not to have anything in his pockets on at least three occasions despite the wand alarm having been triggered and, indeed, despite an obvious bulge in his pocket. However, because this occurred after Aukai's stated intention to leave the airport, we do not address whether this behavior may have been sufficiently suspicious to itself warrant at least a *Terry* stop-and-frisk. *See Terry* v. *Ohio*, 392 U.S. 1, 27-30 (1968).

## A.

[2] Although we held in *Davis* that "airport screening searches are valid only if they recognize the right of a person to avoid [the] search by electing not to board the aircraft," 482 F.2d at 910-11, we did not address when such a choice must be made—that is, whether there is some stage during or after which a prospective passenger may not withdraw his implied consent to a search of his person or carry-on baggage by electing not to fly. *Pulido-Baquerizo*, 800 F.2d at 902 ("*Davis* did not determine at what point in the boarding process a passenger may decide not to fly and thereby withdraw his implied consent."); *Homburg*, 546 F.2d at 1352 ("*Davis* does not state specifically that the consent to additional searches after a preliminary screening may be revoked if a passenger agrees not to board the plane."). Following *Davis*, however, we have addressed this question a number of times.

### 1.

On the one hand, we have implied in a number of cases that a prospective passenger may elect not to fly so as to avoid a search at any time.[5]

Thus, in *United States* v. *Miner*, 484 F.2d 1075, 1076 (9th Cir. 1973), when the defendant attempted to check in for his flight, one of the ticket agents determined that the defendant fit the Federal Aviation Administration's profile for airline highjackers. Accordingly, airline employees escorted the defendant to "a different area of the airport" that was "segregated from the normal boarding area," and asked him to walk through a magnetometer. *Id.* at 1076-77. The defendant agreed. *Id.* at 1076. Although the magnetometer alarm was

---

[5]Of course, even under these cases, a prospective passenger who revokes his consent may be lawfully subjected to a *Terry* stop-and-frisk or, if supported by probable cause, a full search. *E.g., Homburg*, 546 F.2d at 1352-54.

not triggered, the airline employees nonetheless asked the defendant to open a small suitcase that he was carrying. *Id.* The defendant initially refused, but, after further requests, eventually relented, at which point the airline employees found amphetamine pills. *Id.* The district court denied the defendant's motion to suppress the evidence, and the defendant was convicted of possessing amphetamine pills with intent to distribute in violation of 21 U.S.C. § 841(a)(1). *Id.*

We remanded so that the district court could conduct an evidentiary hearing to determine whether the defendant's ultimate acquiescence to the airline employees' repeated requests to search his suitcase was in fact voluntary rather than the product of duress. *Id.* at 1077. In so doing, we explained that although the defendant's "approaching the counter with the obvious intention of boarding a plane amounted to an implied 'consent' within the meaning of *Davis*," his initial refusal to consent to the search of his suitcase "was an apparent withdrawal of the implied 'consent.' " *Id.* at 1076. Citing *Davis*, we held: "At that point, the airline employees would have been justified in refusing to permit him to fly, but they could not compel him to submit to further search. Asking [him] to open his suitcase could be justified only if he continued to manifest an intention to board the plane, or if he otherwise consented to the search." *Id.* (internal citation omitted).

Likewise, in *United States* v. *Moore*, 483 F.2d 1361, 1362 (9th Cir. 1973), the defendant attempted to check in for a flight, but, in the opinion of a customs agent, could not satisfactorily identify himself as the person to whom the ticket had been issued. Accordingly, he was told he would not be permitted to board the airplane, at which point the defendant demanded the return of his two suitcases, which had already been loaded onto the airplane. *Id.* at 1362-63. Upon retrieving them, the defendant attempted to leave the terminal, but customs agents "drew him aside to an unoccupied boarding area," and searched a compartment within one of the suitcases despite his refusal to permit them to do so. *Id.* at 1363. They

discovered marijuana. *Id.* The district court denied the defendant's motion to suppress the evidence, and he was convicted of possessing marijuana with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). *Id.* at 1362. We reversed his conviction, *id.* at 1364, holding in relevant part that the defendant's "bag was not searched as part of an administrative screening search of airline passengers' carry-on luggage such as was approved in [*Davis*]," in part because he "clearly indicated his desire to relinquish the opportunity to board the flight before the search was made." *Id.* at 1363.

In *United States* v. *Homburg*, 546 F.2d 1350, 1351 (9th Cir. 1976), just before the defendant's "carry-on suitcase was subjected to x-ray inspection and he went through the magnetometer" at a security checkpoint, airport officials were notified of a bomb threat. As the defendant passed through the checkpoint, security officials noticed a rectangular bulge in the front portion of the defendant's pants. *Id.* After passing through the checkpoint, the defendant went to a restroom and was followed by a security officer. *Id.* The defendant "went inside a toilet stall and the officer heard a 'cracking or rustling sound, like a plastic bag or something of that nature' coming from inside the toilet stall." *Id.* (internal citation omitted). Then, after about fifteen minutes, the defendant exited the stall. *Id.* "[T]he bulge in his trousers was gone and he was carrying his suitcase normally. [The defendant] then took his place in the boarding line, nervously watching security officers." *Id.* A security officer approached the defendant and told him that he would have to be "reinspected." *Id.* The defendant initially complied, but, upon returning to the security checkpoint, stated that he wished to leave the boarding area. *Id.* He was then forcibly detained, and the security officers opened the suitcase, finding heroin and cocaine within. *Id.* The defendant was charged with possession of heroin with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and possession of cocaine in violation of 21 U.S.C. § 844, and moved to suppress the evidence. *Id.* at 1351-52. The district court denied the motion, and the defendant was convicted. *Id.*

On appeal, we affirmed on the grounds that the search was justified as a *Terry* stop-and-frisk. *Id.* at 1352-54. However, before doing so, we expressly considered and rejected the notion that the defendant had consented to the search or otherwise relinquished Fourth Amendment protections merely by passing through the security checkpoint and entering the secured boarding area:

> The government argues that the search of [the defendant] took place in what it terms a "critical zone" which it compares to a border crossing and where, it argues, "special Fourth Amendment considerations apply." The government submits that "once a passenger enters a secured boarding area, he relinquishes any right to leave without being searched if a security officer's suspicions are aroused." The cases the government cites come primarily from the Fifth Circuit which does appear to have adopted a view of airports as similar to border crossings and qualitatively different from the home or the street for Fourth Amendment purposes.

> While there is authority from this circuit to support the government's view of airports generally [citing *United States* v. *Doran*, 482 F.2d 929, 931 n.1 (9th Cir. 1973)], *we cannot accept the government's argument that a passenger in a secured boarding area may not, as a general proposition, leave the area rather than submit to additional searches.* Such a view runs contrary to the rationale of *United States* v. *Davis*, 482 F.2d 893 (9th Cir. 1973). In that case, we held that the justification for warrantless screening searches is the implied consent of the passenger. "[A]s a matter of constitutional law," we stated in *Davis*, "a prospective passenger has a choice: he may submit to a search of his person and immediate possessions as a condition to boarding; or he may turn around and leave." 482 F.2d at 913. *Davis* does

not state specifically that the consent to additional searches after a preliminary screening may be revoked if a passenger agrees not to board the plane.

*Id.* at 1352 (emphasis added and citations omitted). In *Homburg*, we noted:

> *Davis* strongly indicates . . . that a party may revoke his consent to be searched any time prior to boarding the plane, even when he has passed beyond the initial screening point, if he agrees to leave the boarding area. Other decisions of this court have also recognized that a passenger always maintains the option of leaving. *See, e.g., United States v. Miner*, 484 F.2d 1075 (9th Cir. 1973); *United States v. Moore*, 483 F.2d 1361 (9th Cir. 1973). We must therefore reject the government's view of its power to search within the boarding area as too sweeping. Since the undisputed evidence indicates that appellant wished to leave the boarding area, the trial judge erred in finding the search reasonable under the general doctrine of implied consent.

*Id.* at 1352. Nevertheless, we are not bound by this passage because it is dicta. Indeed, the issue of implied consent to a secondary search was irrelevant in *Homburg* because there, authorities had reasonable suspicion to conduct a *Terry* stop-and-frisk. Moreover, our more recent decisions have undercut the reasoning of the quoted passage. *See infra* Section III.A.2.

Finally, in *United States v. Henry*, 615 F.2d 1223, 1225 (9th Cir. 1980), the defendant's conduct while checking in at the ticket counter aroused the ticket agent's suspicion. So, rather than allowing the defendant to check his briefcase at the ticket counter, the agent told the defendant that he would have to check his briefcase at the gate and, thus, pass his briefcase through screening at the security checkpoint. *Id.* There, the security officers ran the defendant's briefcase

through the x-ray machine twice and saw some "dark objects." *Id.* When the security officers asked the defendant to open his briefcase, he refused and was told that he would have to take the briefcase back to the ticket counter and check it as baggage. *Id.*

The defendant returned to the ticket counter, but the agent took the briefcase and told the defendant to meet him back at the security checkpoint. *Id.* at 1225-26. By the time the ticket agent and his supervisor arrived at the security checkpoint, the defendant had already gone to the boarding area. *Id.* at 1226. The ticket agent and his supervisor left the briefcase at the security checkpoint and proceeded to the boarding area, where the supervisor told the defendant that unless he opened the briefcase he could not take it with him. *Id.* "At this point [the defendant] said, 'I've got to have that bag in Dallas. Okay.' [The defendant] then turned away and boarded the plane." *Id.* Airline personnel then passed the briefcase through the x-ray machine again, at which point a security agent said she thought there might be a gun inside, and eventually forcibly opened the briefcase and discovered, among other things, a loaded revolver. *Id.* The defendant was charged with knowingly delivering a briefcase in which there was a firearm to a common carrier for shipment in interstate commerce without giving written notice in violation of 18 U.S.C. §§ 922(e), 924(a), *id.* at 1225, and moved to suppress the evidence, *id.* at 1227. The district court denied the motion, and the defendant was convicted. *Id.*

We affirmed the conviction, first concluding that the defendant had impliedly consented to the x-ray scans that took place before he boarded the airplane because "he was free to take the briefcase and leave the airport altogether or to board without taking or checking the briefcase, rather than submit it to the x-ray scan." *Id.* at 1229. As for the later search, which we characterized as "not [having been] conducted as part of the program of screening passengers attempting to board," *id.*, we concluded that the defendant had consented when, after

being told that his briefcase would not be allowed on the plane until it was searched, he said that he had to have the briefcase at his destination and then boarded the plane, *id.* at 1230-31. In so doing, we implicitly held that the defendant's implied consent to the initial search did not compel him to submit to all future searches. To the contrary, citing *Davis*, we explained that the defendant's consent to the search that took place after he boarded was valid only to the extent it could have been withdrawn. *Id.* Hence, although the defendant never elected not to fly so as to avoid the later search, his ability to do so even after he passed through the security checkpoint was never in doubt, and was the basis of a finding that his consent to the later search was freely given.[6]

2.

Despite these cases and the rather sweeping language in *Homburg* that "*Davis* strongly indicates . . . that a party may revoke his consent to be searched any time prior to boarding the plane . . . if he agrees to leave the boarding area" and "that a passenger always maintains the option of leaving," *Homburg*, 546 F.2d at 1252, we nonetheless have held that under certain circumstances a prospective passenger may not revoke his consent even by electing not to fly.

In *United States* v. *Pulido-Baquerizo*, 800 F.2d 899, 900 (9th Cir. 1986), the defendant approached the security checkpoint and placed two briefcases onto the x-ray machine's conveyor belt. The security officer operating the x-ray machine noticed an object within one of the briefcases that he thought might be a bomb, but neither he nor the other security officers

---

[6]We note that *Miner, Moore, Homburg* and *Henry* were all decided before September 11, 2001. However, we need not and therefore do not decide whether the events of September 11, 2001, render those cases anachronistic and, thus, whether the government's interest in protecting against terrorism by means of commercial airliners has so increased since we decided these cases that we would now hold the searches there reasonable.

could conclusively identify it as such. *Id.* They ran the brief-case through the x-ray machine a second time, but still could not identify the object. *Id.* at 900-01. The officers then conducted a secondary hand search of the briefcase, which disclosed a large quantity of cocaine. *Id.* Prior to trial, the defendant moved to suppress the evidence obtained by the search and statements he made thereafter, and the district court granted the motion. *Id.* at 901.

We reversed. *Id.* at 900. In what was the first case to address the question of when a passenger may revoke his consent by electing not to fly since *Homburg* and *Henry*, we explained that "[w]hile *Davis* implies a passenger may withhold . . . consent [to secondary screening following an 'inconclusive' x-ray scan] by electing not to fly, *Davis* did not determine at what point in the boarding process a passenger may decide not to fly and thereby withdraw his implied consent" and, thus, "*Davis* does not specifically hold that consent to an additional search could be withdrawn after an inconclusive x-ray scan if the passenger agreed not to board the plane." *Id.* at 902. We noted further that although "we refused to adopt [in *Homburg*] a general doctrine of implied consent in the context of airport luggage searches," we nevertheless "noted [in *Henry*] that the precise issue of whether implied consent to a subsequent search existed by the mere fact of placing luggage on the x-ray machine remained undecided." *Id.*

[3] Having set forth our understanding of our prior precedent, we then specifically rejected the defendant's reliance on *Davis* in arguing that he had made statements prior to the secondary search that "show[ed] he preferred to leave [the airport] rather than submit to the [secondary] search," *id.* at 902, and held:

> [T]hose passengers placing luggage on an x-ray machine's conveyor belt for airplane travel at a secured boarding area impliedly consent to a [sec-

ondary] visual inspection and limited hand search of
their luggage if the x-ray scan is inconclusive in
determining whether the luggage contains weapons
or other dangerous objects.

*Id.* at 901. Accordingly, "[t]he requirement in *Davis* of allow-
ing passengers to avoid the search by electing not to fly does
not extend to a passenger who has already submitted his lug-
gage for an x-ray scan" where the initial screening is "incon-
clusive," and, "[t]hus, if a potential passenger [wishes] to
avoid a [secondary] search [in the event of an 'inconclusive'
initial screening], he must elect not to fly before placing his
baggage on the x-ray machine's conveyor belt." *Id.* at 902.

We note that *Pulido-Baquerizo* is not in direct conflict with
earlier cases such as *Miner* and *Homburg*, which stand for the
principle that prospective passengers can have the power to
limit their consent to airport searches even after voluntarily
submitting to initial screening procedures. The existence and
scope of implied consent must be examined in light of all the
circumstances, and such circumstances—and correlated soci-
etal expectations—may change over time. *See Davis*, 482
F.2d at 913 (noting that the burden on the defendant must be
measured against "the clear necessities of current circum-
stances"); *Miner*, 484 F.2d at 1076 (examining whether
implied consent existed in light of societal and individual con-
tingencies, including that "concern over the problem of air-
plane hijacking was at its peak"). Earlier cases did not arise
in the context of now-familiar modern screening procedures,
in which the parallel use of magnetometer and x-ray scans is
practically ubiquitous, nor in the context of modern under-
standings about the class of objects that might present sub-
stantial danger on an airplane. *See infra* Section III.B.2. Our
holding in *Pulido-Baquerizo* with respect to the scope and
irrevocability of implied consent is consistent with the earlier
opinions in light of the changed circumstances, expectations,
and technology involved in modern air travel and airport
screening. *See Pulido-Baquerizo*, 800 F.2d at 901-02 (exam-

ining what "free society is willing to tolerate" in light of contemporary circumstances).

Recently, in *Torbet* v. *United Airlines, Inc.*, 298 F.3d 1087 (9th Cir. 2002), we revisited our holding in *Pulido-Baquerizo*. Torbet walked through the magnetometer at a security checkpoint, and his carry-on bag passed through the x-ray machine, all apparently without triggering an alarm or otherwise arousing suspicion. *Id.* at 1088. Nevertheless, acting pursuant to a policy of randomly searching bags, even without the slightest suspicion that a particular bag contained weapons or explosives, airport security personnel selected Torbet's bag for such a random search. *Id.* He refused to consent to the secondary search of his bag, stating instead that he wished simply to leave the airport. *Id.* Torbet was nevertheless detained, and his bag was searched.[7] *Id.* The search revealed nothing of note. *Id.* Pursuant to 42 U.S.C. § 1983, Torbet then sued the airline, airport, and police officer that conducted the search, alleging in relevant part that the random search to which he had not consented violated his Fourth Amendment right against unreasonable searches insofar as the initial screening did not arouse suspicion that his bag contained weapons or explosives. *Id.* at 1088-89. The defendants moved for judgment on the pleadings, which the district court granted. *Id.*

[4] We affirmed and held that a potential passenger irrevocably consents to a secondary screening when he voluntarily submits to an initial screening that is "inconclusive" as to the presence of weapons or explosives. *Id.* at 1089. We then interpreted the term "inconclusive" broadly:

> [A]n x-ray scan may be deemed inconclusive, justifying further search, *even when it doesn't affirmatively reveal anything suspicious.* "[F]irearms and explosives can be small and easily concealed." Con-

---

[7]Torbet's person was not subjected to a secondary search. *See Torbet,* 298 F.3d at 1088.

sequently, any x-ray scan that doesn't rule out *every* possibility of dangerous contents is, *of necessity*, inconclusive.

*Id.* at 1089-90 (emphases added) (internal citation omitted).[8] Therefore, even when a secondary screening is triggered solely as part of a systemized random search policy—the initial screening "doesn't affirmatively reveal anything suspicious"—the initial screening prohibits the potential passenger from revoking his implied consent for the secondary screening if there still is a chance the passenger may be carrying as-yet-undetected weapons or explosives.[9] In other words, the "inconclusive" nature of a proper initial screening, by itself, establishes that the potential passenger has impliedly consented to a secondary screening.[10]

---

[8] In *Torbet*, we disagreed with the district court's interpretation of *Pulido-Baquerizo* "that consent to an x-ray scan [itself] implies consent to further search, regardless of whether the x-ray scan is 'inconclusive' or 'flatly devoid of suspicious features.' " *Torbet*, 298 F.3d at 1089. Rather, given that current airport screening cannot rule out every possibility of weapons or explosives, we clarified *Pulido-Baquerizo* to hold instead that "an x-ray scan may be deemed inconclusive, justifying further search, even when it doesn't affirmatively reveal anything suspicious." *Id.* Because the currently accepted class of dangerous items is far broader than what current screening technology could conclusively rule out, the district court's interpretation of *Pulido-Baquerizo* in *Torbet* and our interpretation of *Pulido-Baquerizo* currently have the same practical effect—once a potential passenger voluntarily submits to an initial screening at an airport, he or she cannot revoke consent to a secondary search.

[9] We considered again the reasonableness of a random search during the screening process at an airport security checkpoint in *Marquez*. 410 F.3d at 616-18. However, we expressly did not consider whether the defendant there elected not to fly so as to avoid the search, explaining that "[t]here is no evidence before us that [he] ever changed his mind about flying to Anchorage and that issue was neither briefed nor argued by the parties." *Id.* at 618.

[10] Of course, a potential passenger does not impliedly consent to *any and all* types of secondary search by submitting to an inconclusive initial search. The scope of a potential passenger's implied consent is circum-

## B.

[5] Having now surveyed our relevant precedent, we conclude that the secondary screening at issue here is most akin to that which we held reasonable in *Torbet*. Both here and in *Torbet*, the contested search occurred at the security checkpoint, but after the prospective passenger had voluntarily passed through initial screening, which, although it did not "affirmatively reveal anything suspicious," was nonetheless "inconclusive" insofar as it did not "rule out every possibility of dangerous contents." *Torbet*, 298 F.3d at 1089-90. Accordingly, we follow the reasoning underlying *Torbet* in holding that Aukai impliedly consented to a secondary search of his person by walking through the magnetometer, and that he could not subsequently revoke his consent to the secondary screening. We recognize, of course, that the screening here was different from that in *Torbet* in three respects: (1) whereas the initial screening here was conducted by a magnetometer, the initial screening in *Torbet* was conducted by an x-ray machine; (2) whereas the contested search here was of Aukai himself, the contested search in *Torbet* was of the prospective passenger's carry-on baggage rather than his person; and (3) whereas the contested search here was triggered by Aukai's failure to present identification when checking in, the contested search in *Torbet* was the product of random selection. Nonetheless, for the reasons explained below, we find none of these differences of distinguishing significance.

---

scribed by the *Davis* test's two other necessary elements, neither of which are at issue in this case: "that [the secondary search] is no more extensive nor intensive than necessary, in light of current technology, to detect the presence of weapons or explosives, [and] that it is confined in good faith to that purpose." 482 F.2d at 913. Unlike the criminal search context where a court infers the scope of implied consent from the particular details surrounding an *individual's* exchange with an officer, *see Florida v. Jimeno*, 500 U.S. 248, 251 (1991), the *Davis* test systematizes the inquiry according to *society's* privacy expectations in light of airport searches' broad regulatory policy of preventing terrorism, *see Pulido-Baquerizo*, 800 F.2d at 901-02.

1.

[6] As explained above, in *Torbet*, we defined "inconclusive" to encompass an x-ray scan that does not "affirmatively reveal anything suspicious" insofar as it also does not "rule out every possibility of dangerous contents." *Id.* at 1089-90. Thus, in *Torbet*, we upheld a secondary search resulting from random selection, which, by definition, results in "searching bags even without suspicion that a particular bag contained weapons or explosives." *Id.* at 1088. Nothing about this definition of "inconclusive" is necessarily limited to x-ray scans as opposed to magnetometers. Rather, recognizing the limits of current technology, *see Davis*, 482 F.2d at 913, we simply acknowledged the fact that just because an x-ray machine does not reveal weapons or explosives in a passenger's carry-on baggage does not mean that they are not there. *Torbet*, 298 F.3d at 1089-90; *accord Pulido-Baquerizo*, 800 F.2d at 901. We find no reason to consider Aukai's magnetometer search any more conclusive than the x-ray scan at issue in *Torbet*. In the first place, a magnetometer may allow small amounts of metal through without alarming, either because the metal was not detected or because the amount detected was below the threshold at which the magnetometer alarms. *Cf. Marquez*, 410 F.3d at 617 (noting that a walkthrough magnetometer was "less sensitive" than a handheld one); *Doran*, 482 F.2d at 930 (noting that a magnetometer was calibrated not to alarm for small quantities of metal). Indeed, in the present case, the metal objects that were (as it happens) in Aukai's pockets did not set off the walkthrough magnetometer's alarm. More important, it is hard to imagine how a magnetometer could possibly detect prohibited items that do not contain metal. *See* Permitted and Prohibited Items List, available at http://www.tsa.gov/public/interapp/editorial/editorial_1012.xml (listing among the prohibited items, for example, flammable liquids, matches, and realistic replicas of certain prohibited items). We therefore hold that, for the purposes of the implied consent inquiry, the screening by the walkthrough magnetometer did not "rule out every possibility of dangerous contents"

and was therefore "inconclusive" under *Torbet*, 298 F.3d at 1089-90.

2.

We similarly find that, under the rationale of our prior opinions, Aukai's arguments are not saved simply because it was his person, rather than his baggage, that was subjected to a secondary search. We recognize, of course, that a search of a prospective passenger's person may implicate greater privacy concerns than does a search of his carry-on baggage and, thus, that there may be instances where particularly intrusive searches of a prospective passenger's person cannot be permitted even following "inconclusive" initial screening absent consent, some particularized suspicion sufficient to justify a *Terry* stop-and-frisk, or probable cause. However, like the search in *Pulido-Baquerizo*, we believe that the magnetometer scan and the subsequent search conducted here "involve[d] only a slight privacy intrusion" that "we believe free society is willing to tolerate," because the "governmental interest in detecting the weapons employed in airline terrorism is great" and because the search was limited in scope to "the detection of weapons, explosives, or any other dangerous devices and [was] conducted in a manner which produces negligible social stigma." 800 F.2d at 901-02; *see also Torbet*, 298 F.3d at 1089-90.

[7] There is no doubt that Aukai was on notice that his person could be searched. *See Pulido-Baquerizo*, 800 F.2d at 902 (requiring notice). Furthermore, the government interest is just as great here as in the cases involving baggage searches. Indeed, the events of September 11, 2001, have highlighted that items a passenger could carry in his pocket may be just as dangerous as what his carry-on baggage could contain. *See, e.g.*, National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Executive Summary* (2004), available at 2004 WL 1846272, at *2 (noting that terrorists "turned [four planes] into deadly guided mis-

siles" using only "small knives, box cutters, and cans of Mace
or pepper spray"); *see also* Permitted and Prohibited Items
List, available at http://www.tsa.gov/public/interapp/editorial/
editorial_1012.xml (listing numerous prohibited items that are
pocket-sized). Moreover, the search itself involved "only a
slight privacy intrusion." *Pulido-Baquerizo*, 800 F.2d at 901-
02. The security agents here used a wand to detect any metal
objects on Aukai's person, patted the outside of Aukai's pants
pockets, and directed Aukai to empty his pockets—all meth-
ods that were minimally intrusive to Aukai's privacy in light
of his repeated non-cooperation. *See Marquez*, 410 F.3d at
616 (holding that a handheld magnetometer scan of a prospec-
tive passenger's person was constitutionally permissible).
Finally, allowing a passenger in Aukai's position to revoke
his consent prior to the secondary screening would, to the
same extent contemplated in *Pulido-Baquerizo*, "encourage
airline terrorism by providing a secure exit where detection
was threatened," 800 F.2d at 902, and thus undermine the
essential deterrent purpose of such airport screenings. *See
Davis*, 482 F.2d at 908; *Marquez*, 410 F.3d at 617; *see also
Torbet*, 298 F.3d at 1090 ("[T]he Fourth Amendment does not
require that passengers be given a safe exit once detection is
threatened."); *Pulido-Baquerizo*, 800 F.2d at 902 (noting that
an "airport screening agent has a duty to ferret out firearms
and explosive devices carried by passengers," a duty that
"could not be fulfilled if the agent was prohibited from con-
ducting a visual inspection and limited hand search after an
inconclusive x-ray scan"). In light of these concerns, the fact
that Aukai's person was searched, rather than his baggage,
provides no basis for distinguishing the rule enunciated in
*Pulido-Baquerizo* and *Torbet*—namely, that implied consent
to an inconclusive initial search cannot be revoked prior to a
secondary search at a contemporary airport screening station.

3.

There is, of course, no question that our holding in *Torbet*
was in the context of a secondary screening that was the prod-

uct of random selection. Nevertheless, we do not find random selection to be materially distinct from the trigger for secondary screening here—that is, Aukai's failure to present identification upon checking in. Both depend on wholly objective mechanisms for requiring secondary screening as opposed to merely subjective evaluations by airline or security personnel. By virtue of the objective criteria upon which they rely, both suggest of themselves "the absence of any indicia of improper motive." *Marquez*, 410 F.3d at 618. Indeed, as with the random selection upheld in *Torbet*, we have expressly upheld the constitutionality of subjecting airline passengers who lack identification to a more thorough search. *See Gilmore* v. *Gonzales*, 435 F.3d 1125 (9th Cir. 2006). Hence, we need not and therefore do not decide today whether a secondary screening triggered by nothing more than the subjective evaluation of the prospective passenger by airline or security personnel violates the *Davis* test's requirement that an airport search be "confined in good faith to [detect the presence of weapons or explosives]," *see* 482 F.2d at 913, rather than more objective criteria such as a screening machine alarm being triggered (*Doran*), a screening machine otherwise signaling the possible presence of weapons, explosives or other destructive devices (*Pulido-Baquerizo*), random selection (*Torbet*), or, as here, the prospective passenger's failure to present identification upon checking in.

AFFIRMED.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2006 Thomson/West.

MOATT  INVATT
i

INTERNAL USE ONLY: Proceedings include all events.
04-10226 USA v. Aukai

UNITED STATES OF AMERICA              Thomas J. Brady, Esq.
      Plaintiff - Appellee           FAX 808/541-2958
                                     808/541-2850
                                     Suite 6-100
                                     [COR LD NTC aus]
                                     Loretta A. Sheehan, Esq.
                                     FAX 808/541-2958
                                     808/541-2850
                                     Suite 6-100
                                     [COR LD NTC aus]
                                     USH - OFFICE OF THE U.S.
                                     ATTORNEY
                                     PJKK Federal Building
                                     300 Ala Moana Blvd.
                                     P.O. Box 50183
                                     Honolulu, HI 96850


      v.

DANIEL KUUALOHA AUKAI                 Pamela O'Leary Tower, Esq.
      Defendant - Appellant           FAX 808/533-4588
                                      808/526-9500
                                      1330 Pacific Tower
                                      [COR LD NTC ret]
                                      1001 Bishop Street
                                      Honolulu, HI 96813



A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

APR 1 0 2006

by: CP
      Deputy Clerk

Docket as of December 7, 2005 11:08 pm              Page 2    NON-PUBLIC