# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

V.

DANIEL KUUALOHA AUKAI,

      Defendant - Appellant.

No.  04-10226
D.C. No.  CR-03-00062-1-HG

**JUDGMENT**

FILED IN THE
UNITED STATES DISTRICT CO-
DISTRICT OF HAWAII
SEP 0 6 2007
at ___ o'clock and ___ min.
SUE BEITIA, CLERK

      Appeal from the United States District Court for the District of Hawaii (Honolulu).

      This cause came on to be heard on the Transcript of the Record from the United States District Court for the District of Hawaii (Honolulu) and was duly submitted.

      On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said District Court in this cause be, and hereby is **AFFIRMED**.

Filed and entered 08/10/07

A TRUE COPY
ATTEST

CATHY A. CATTERSON
Clerk of Court

by
Deputy Clerk

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

            v.

DANIEL KUUALOHA AUKAI,
                    *Defendant-Appellant.*

No. 04-10226

D.C. No.
CR-03-00062-1-HG

OPINION

Appeal from the United States District Court
for the District of Hawaii
Helen Gillmor, District Judge, Presiding

Argued and Submitted En Banc
March 21, 2007—San Francisco, California

Filed August 10, 2007

Before: Mary M. Schroeder, Chief Judge, Alex Kozinski,
Andrew J. Kleinfeld, Michael Daly Hawkins,
Barry G. Silverman, Susan P. Graber,
M. Margaret McKeown, Kim McLane Wardlaw,
William A. Fletcher, Ronald M. Gould,
Johnnie B. Rawlinson, Jay S. Bybee, Consuelo M. Callahan,
Carlos T. Bea, and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Bea;
Concurrence by Judge Graber

# SUMMARY

### Criminal Law and Procedure/Search and Seizure

The court of appeals affirmed a judgment of the district court. The court held that where an airport screening search is otherwise reasonable and conducted pursuant to statutory authority, 49 U.S.C. § 44901, all that is required is the passenger's election to attempt entry into the secured area of an airport; that election occurs when a prospective passenger walks through a magnetometer or places items on the conveyor belt of the x-ray machine.

Appellant Daniel Aukai was charged in district court in Hawaii with methamphetamine possession after a Transportation Security Administration (TSA) officer searched him at the Honolulu International Airport—pursuant to TSA procedures that allow secondary screening of a passenger who presents a boarding pass on which "No ID" has been written—and found the drugs. A secondary screening consists of a TSA officer passing a handheld magnetometer, which sounds an alarm if it detects metal, near and around the passenger's body. At Aukai's secondary screening, the alarm was triggered by a glass pipe in his pocket. After unsuccessfully moving to suppress the evidence found at the airport and his subsequent inculpatory statement, Aukai pleaded guilty, preserving his right to appeal the denial of his suppression motion. The district court sentenced Aukai to 70 months in prison.

Aukai appealed his conviction. A three-judge panel initially affirmed the district court, but the court of appeals vacated that opinion and took the case en banc.

[1] A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. However, where the risk to public safety is substantial and real, blanket

suspicionless searches calibrated to the risk may rank as "reasonable"—for example, searches now routine at airports and at entrances to courts and other official buildings. [2] The Supreme Court has repeatedly upheld the constitutionality of so-called "administrative searches." [3] It has also held that the constitutionality of administrative searches is not dependent upon consent.

[4] The Ninth Circuit has held that airport screening searches, like Aukai's, are constitutionally reasonable administrative searches. Ninth Circuit case law, however, has erroneously suggested that the reasonableness of airport screening searches is dependent upon consent, either ongoing consent or irrevocable implied consent.

[5] The constitutionality of an airport screening search, however, does not depend on consent, and requiring that a potential passenger be allowed to revoke consent to an ongoing airport security search would, post 9/11, afford terrorists multiple opportunities to attempt to penetrate airport security. It had to be held that where an airport screening search is otherwise reasonable and conducted pursuant to statutory authority, all that is required is the passenger's election to attempt entry into the secured area of an airport. Under current TSA regulations and procedures, that election occurs when a prospective passenger walks through the magnetometer or places items on the conveyor belt of the x-ray machine. Aukai elected to attempt entry into the posted secured area of the airport when he walked through the magnetometer, thereby subjecting himself to the airport screening process. [6] To the extent Ninth Circuit cases have predicated the reasonableness of an airport screening search upon either ongoing consent or irrevocable implied consent, they had to be overruled.

[7] The scope of airport screening searches is not limitless. A particular airport security screening search is constitutionally reasonable if it is no more extensive or intensive than necessary to detect the presence of weapons or explosives and

is confined in good faith to that purpose. **[8]** The procedures used to search Aukai were neither more extensive nor more intensive than necessary under the circumstances to rule out the presence of weapons or explosives. **[9]** The duration of the detention associated with the search, which took no more than 18 minutes, was also reasonable. It was not prolonged beyond the time reasonably required to rule out the presence of weapons or explosives. **[10]** It had to be held that the airport screening search of Aukai was a constitutionally reasonable administrative search. The judgment of the district court had to be affirmed.

Judge Graber specially concurred, writing separately because she could not join the majority's irrelevant and distracting references to 9/11 and terrorists; by relying on those factors, the majority unnecessarily made its solid holding dependent on the existence of the current terrorist threat, inviting future litigants to retest the viability of that holding.

---

## COUNSEL

Pamela O'Leary Tower, Esq., Honolulu, Hawaii, for defendant-appellant Daniel Kuualoha Aukai.

Thomas J. Brady, Esq., Assistant United States Attorney, District of Hawaii and John A. Drennan, Esq, United States Department of Justice Criminal Division, Appellate Section, Washington, D.C., for defendant-appellee the United States of America.

---

## OPINION

BEA, Circuit Judge:

More than 700 million passengers board commercial air-

craft in the United States each year.[1] The Transportation Security Administration ("TSA") is given the task of ensuring their safety, the safety of airline and airport personnel and, as the events of September 11, 2001, demonstrate, the safety of the general public from risks arising from commercial airplane flights. To do so, the TSA conducts airport screening searches of all passengers entering the secured area of the airport. We have previously held such airport screening searches are constitutionally reasonable administrative searches. Today we clarify that the reasonableness of such searches does not depend, in whole or in part, upon the consent of the passenger being searched.

## I.

## A.

On February 1, 2003, Daniel Kuualoha Aukai arrived at the Honolulu International Airport intending to take a Hawaiian Airlines flight from Honolulu, Hawaii, to Kona, Hawaii. He proceeded to check in at the ticket counter but did not produce a government-issued picture identification. Accordingly, the ticket agent wrote the phrase "No ID" on Aukai's boarding pass.

Aukai then proceeded to the security checkpoint, at which signs were posted advising prospective passengers that they and their carry-on baggage were subject to search. He entered the security checkpoint at approximately 9:00 a.m., placed his shoes and a few other items into a plastic bin, and voluntarily walked through the metal detector or magnetometer. The parties agree that the magnetometer did not signal the presence of metal as Aukai walked through it. Nor did his belongings trigger an alarm or otherwise raise suspicion as they passed

---

[1]*See* Bureau of Transportation Statistics, February 2007 Airline Traffic Data, http://www.bts.gov/press_releases/2007/bts022_07/html/bts022_07.html (last visited May 18, 2007).

through the x-ray machine. After walking through the magnetometer, Aukai presented his boarding pass to TSA Officer Corrine Motonaga.

Pursuant to TSA procedures, a passenger who presents a boarding pass on which "No ID" has been written is subject to secondary screening even if he has passed through the initial screening without triggering an alarm or otherwise raising suspicion. As it was performed here, secondary screening consists of a TSA officer passing a handheld magnetometer, known as a "wand," near and around the passenger's body. If the wand detects metal, it sounds an alarm. The TSA officer then discerns the cause of the alarm, using techniques such as feeling the outside of the passenger's clothes in the area that caused the alarm and, if that area is near a pocket, directing the passenger to empty his pocket.

Because Aukai's boarding pass had the "No ID" notation, Motonaga directed Aukai to a nearby, roped-off area for secondary screening. Aukai initially complied but complained that he was in a hurry to catch his flight which, according to the boarding pass, was scheduled to leave at 9:05 a.m., just a few minutes later. Although Aukai went to the roped-off area as directed, he did not stay there. When Motonaga noticed that Aukai had left the area and was gathering his belongings from the plastic bin, she instructed Aukai that he was not allowed to retrieve his property and that he had to stay in the roped-off area.

Aukai then appealed to TSA Officer Andrew Misajon, who was to perform the secondary screening, explaining again that he was in a hurry to catch his flight. Misajon nonetheless had Aukai sit in a chair and proceeded to use the wand to detect metal objects. At some point, Misajon had Aukai stand, and when Misajon passed the wand across the front of Aukai's body, the wand alarm was triggered at Aukai's front right pants pocket. Misajon asked Aukai if he had anything in his pocket, and Aukai responded that he did not. Misajon passed

the wand over the pocket a second time; again the wand alarm was triggered. Misajon again inquired whether Aukai had anything in his pocket; again Aukai said he did not. Misajon then felt the outside of Aukai's pocket and concluded that something was inside the pocket. Misajon could also see the outline of an unknown object in Aukai's pocket. At some point during this screening process, Aukai informed Misajon that he no longer wished to board a plane and wanted to leave the airport.

At this point, TSA Supervisor Joseph Vizcarra approached Misajon and asked whether he needed assistance. Misajon related the events and Vizcarra asked Misajon to pass the wand over Aukai's pocket again. When the wand alarm again was triggered, Vizcarra directed Aukai to empty his pocket. Aukai again protested that he had nothing in his pocket. Using the back of his hand, Vizcarra touched the outside of Aukai's pocket and felt something in the pocket. He again directed Aukai to empty his pocket. This time Aukai reached into his pocket and removed either his keys or change, but a bulge was still visible in his pocket. Vizcarra directed Aukai to remove all contents from his pocket. After claiming at first that there was nothing more, Aukai finally removed an object wrapped in some form of tissue paper and placed it on a tray in front of him.

Suspecting that the object might be a weapon, Vizcarra summoned a nearby law enforcement officer. Vizcarra then unwrapped the object and discovered a glass pipe used to smoke methamphetamine. The law enforcement officer escorted Aukai to a small office near the security checkpoint. Aukai was placed under arrest and was searched incident to his arrest. During the search, the police discovered in Aukai's front pants pockets several transparent bags containing a white crystal substance. Aukai eventually was taken into federal custody, where he was advised of and waived his *Miranda* rights, and then gave a statement in which he inculpated himself in the possession of methamphetamine.

### B.

Aukai was indicted for knowingly and intentionally possessing, with the intent to distribute, 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a) and 841(b)(1)(A)(viii). Aukai filed a motion to suppress the evidence found incident to his arrest at the airport and the statement he later made, which the district court denied. Aukai then pleaded guilty pursuant to a written plea agreement that preserved his right to appeal the denial of his suppression motion. The district court sentenced Aukai to a term of imprisonment of 70 months and a term of supervised release of 5 years. Aukai timely appealed.

### II.

We review de novo the district court's legal basis for denying a motion to suppress, but review the district court's findings of fact for clear error. *United States v. Marquez*, 410 F.3d 612, 615 (9th Cir. 2005) (as amended).

### III.

[1] The Fourth Amendment requires the government to respect "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. While such suspicion is not an 'irreducible' component of reasonableness, [the Supreme Court has] recognized only limited circumstances in which the usual rule does not apply." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (citations omitted). However, "where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'—for example, searches now routine at airports and at entrances to courts and other official buildings." *Chandler v. Miller*, 520 U.S. 305, 323 (1997) (holding Georgia's requirement that candidates for

state office pass a drug test did not fit within this exception) (citing *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 674-76 & n.3 (1989) (upholding warrantless drug testing of employees applying for promotion to positions involving drug interdiction)). Thus, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 489 U.S. at 665-66.

**[2]** Under this rationale the Supreme Court has repeatedly upheld the constitutionality of so-called "administrative searches."[2] In *New York v. Burger*, 482 U.S. 691 (1987), the Supreme Court upheld the warrantless search of a junkyard's records, permits, and vehicles. The Supreme Court reasoned: "Because the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search have lessened application . . . ." *Id.* at 702 (internal citation omitted). Thus, New York's interest in regulating the junkyard industry, in light of the rise of motor-theft and comprehensive motor vehicle insurance premiums, served as a "special need" allowing inspection without a warrant. *Id.* at 708-09; *see also id.* at 702. The regulatory statute also provided a "constitutionally adequate sub-

---

[2]The Supreme Court has not specifically *held* that airport screening searches are constitutionally reasonable administrative searches. On three occasions, however, the Supreme Court has *suggested* that airport screening searches are constitutionally reasonable administrative searches. *See Miller*, 520 U.S. at 323; *Edmond*, 531 U.S. 47-8 ("Our holding also does not affect the validity of border searches or searches at places like airports and government buildings, where the need for such measures to ensure public safety can be particularly acute."); *Von Raab*, 489 U.S. at 675 n.3 (approving of lower court decisions upholding airport screening searches where there was no reason for suspicion).

stitute for a warrant" because the statute informed junkyard operators that inspections would be made on a regular basis and limited the discretion of inspecting officers. *Id.* at 711.

In *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990), Sitz challenged the constitutionality of suspicion-less sobriety checkpoints conducted on Michigan's highways, contending that the program violated the Fourth Amendment's protection against unreasonable seizures. *Id.* at 447-48. The Supreme Court upheld the sobriety checkpoints because "the balance of the State's interest in preventing drunken driving, the extent to which [the sobriety checkpoints] can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of" finding the sobriety checkpoints constitutionally reasonable. *Id.* at 455.

[3] Significantly, the Supreme Court has held that the constitutionality of administrative searches is not dependent upon consent. In *United States v. Biswell*, 406 U.S. 311 (1972), the Supreme Court upheld the warrantless search of a pawn shop owner's gun storeroom. The search was authorized by a federal gun control statute. The Court held that, "[i]n the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute."[3] *Id.* at 315. Thus, "[w]hen a [gun] dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." *Id.* at 316.

[4] We have held that airport screening searches, like the one at issue here, are constitutionally reasonable administra-

---

[3]The gun shop search in *Biswell* was authorized by 18 U.S.C. § 923(g) (1968). *See Biswell*, 406 U.S. at 311-12. Airport screening searches are mandated by a federal law. *See* 49 U.S.C. § 44901; 49 C.F.R. § 1540.107.

tive searches because they are "conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings." *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973); *see also United States v. Hartwell*, 436 F.3d 174, 178 (3d Cir.), *cert. denied*, 127 S.Ct. 111 (2006); *Marquez*, 410 F.3d at 616. Our case law, however, has erroneously suggested that the reasonableness of airport screening searches is dependent upon consent, either ongoing consent[4] or irrevocable implied consent.[5]

[5] The constitutionality of an airport screening search, however, does not depend on consent, *see Biswell*, 406 U.S. at 315, and requiring that a potential passenger be allowed to revoke consent to an ongoing airport security search makes little sense in a post-9/11 world.[6] Such a rule would afford terror-

---

[4]*See Davis*, 482 F.2d 910-11 (stating that airport screening searches are "valid only if they recognize the right of a person to avoid search by electing not to board the aircraft"); *United States v. Homburg*, 546 F.2d 1350, 1352 (9th Cir. 1976) (stating that "a party may revoke his consent to be searched any time prior to boarding the plane, even when he has passed beyond the initial screening point, if he agrees to leave the boarding area").

[5]*See United States v. Pulido-Baquerizo*, 800 F.2d 899, 902 (9th Cir. 1986) (holding that "[t]he requirement in *Davis* of allowing passengers to avoid the search by electing not to fly does not extend to a passenger who has already submitted his luggage for an x-ray scan . . . . [:] he must elect not to fly before placing his baggage on the x-ray machine's conveyor belt"); *Torbet v. United Airlines, Inc.*, 298 F.3d 1087, 1089 (9th Cir. 2002) (holding that a potential airline passenger irrevocably consents to a secondary search that is inclusive of the initial screening because he impliedly consents to an inclusive secondary search by submitting to the screening process).

[6]The concurrence fears that references to 9/11 and terrorists are irrelevant and will invite future litigants to challenge our holding if and when the threat of organized terrorist activity at our airports recedes. But the present threat of organized terrorists using the 9/11 tactic of hijacking commercial aircraft, intending to use the aircraft as a weapon, is relevant

ists[7] multiple opportunities to attempt to penetrate airport

to the reasonableness of the search procedures employed. This new terrorist tactic was the impetus behind the Aviation Transportation Security Act, Pub. L. No. 107-71, § 110, 115 Stat. 597, 614-15 (2001), which authorizes the airport screening at issue in this case. *See* H.R. Rep. No. 107-296, at 53-54 (2001) (Conf. Rep.), *as reprinted in* 2002 U.S.C.C.A.N. 589, 590 ("The conferees further note the terrorist hijacking and crashes of passenger aircraft on September 11, 2001, which converted civil aircraft into guided bombs for strikes against the United States, required a fundamental change in the way it approaches the task of ensuring the safety and security of the civil air transportation system."). Here, the search procedures employed included the completion of secondary screening on a passenger who had stated he no longer wished to fly. The concurrence may well be correct that as an original proposition, the present threat of terrorism is not necessary for this procedure to be reasonable under the Fourth Amendment. That had not been our circuit's law prior to 9/11; an intending passenger could refuse to be searched at the airport if he stated he had changed his mind and no longer wished to fly. *See Homburg*, 546 F.2d at 1352. The adoption of a contrary rule based on a factual situation not present—elimination of the historical fact of 9/11 and the lack of an organized terrorist threat—would be speculative. Since we must decide "cases and controversies" only, we should decide only whether the secondary search of Aukai was reasonable under the Fourth Amendment under the circumstances presented and state why. That is what we have strived to do. What search procedures will be "reasonable" when terrorists are no longer threatening us, or when technology is developed that eliminates the present threat, should be decided when, if ever, that happy day dawns. We should also be wary to eliminate historical facts such as 9/11. Orwell warned us: "Who controls the present controls the past . . . ." George Orwell, 1984, Book Three, Chapter II (1949).

---

[7]"Terrorists" are those persons who engage in or attempt to engage in acts of "terrorism", as that term is defined in the Homeland Security Act of 2002, Pub. L. No. 107-296, § 101, 116 Stat 2135, 2141 (2002):

> The term "terrorism" means any activity that—
>
> (A) involves an act that—
>
> (i) is dangerous to human life or potentially destructive of critical infrastructure or key resources; and
>
> (ii) is a violation of the criminal laws of the United States or of any State or other subdivision of the United States; and

security by "electing not to fly" on the cusp of detection until a vulnerable portal is found. This rule would also allow terrorists a low-cost method of detecting systematic vulnerabilities in airport security, knowledge that could be extremely valuable in planning future attacks. Likewise, given that consent is not required, it makes little sense to predicate the reasonableness of an administrative airport screening search on an irrevocable implied consent theory. Rather, where an airport screening search is otherwise reasonable and conducted pursuant to statutory authority, 49 U.S.C. § 44901, all that is required is the passenger's election to attempt entry into the secured area[8] of an airport. *See Biswell*, 406 U.S. at 315; 49 C.F.R. § 1540.107. Under current TSA regulations and procedures, that election occurs when a prospective passenger

---

(B) appears to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping.

116 Stat 2135, 2141.

[8]"Secured area" is defined as the "portion of an airport, specified in the [TSA] airport security program, . . . where aircraft operators and foreign air carriers . . . enplane and deplane passengers . . . ." 49 C.F.R. § 1540.5. The secured area includes the "sterile area," which "means [the] portion of an airport defined in the [TSA] airport security program that provides passengers access to boarding aircraft and to which the access generally is controlled by TSA . . . through the screening of persons and property." *Id.* Because of security concerns, the Government has not made public the details of "airport security programs." *See* 49 U.S.C. § 114(s); 49 C.F.R. § 1520.5. Hence, we do not speculate on how far such "sterile" and "secured" areas extend from the airplane boarding gate to the street door. Suffice it to say that such "secured area" extends at least as far as the point at which a prospective passenger places hand luggage on a conveyor belt for inspection, *Torbet*, 298 F.3d at 1089, or passes through a magnetometer, *Marquez*, 410 F.3d at 617. We accept the Government's position at oral argument, on this point. *See infra* note 9.

UNITED STATES v. AUKAI

walks through the magnetometer or places items on the conveyor belt of the x-ray machine.[9] The record establishes that Aukai elected to attempt entry into the posted secured area of Honolulu International Airport when he walked through the magnetometer, thereby subjecting himself to the airport screening process.

[6] To the extent our cases have predicated the reasonableness of an airport screening search upon either ongoing consent or irrevocable implied consent, they are overruled.

## IV.

[7] Although the constitutionality of airport screening searches is not dependent on consent, the scope of such searches is not limitless. A particular airport security screening search is constitutionally reasonable provided that it "is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives [ ] [and] that it is confined in good faith to that purpose." *Davis*, 482 F.2d at 913. We conclude that the airport screening search of Aukai satisfied these requirements.

[8] The search procedures used in this case were neither more extensive nor more intensive than necessary under the circumstances to rule out the presence of weapons or explosives. After passing through a magnetometer, Aukai was directed to secondary screening because his boarding pass was marked "No ID." Aukai then underwent a standard "wanding procedure." When the wand alarm sounded as the

---

[9]The Government asserted during oral argument that regulations and procedures tying this election to an earlier point in time, *i.e.*, entering the airport screening line or the presentation of a boarding pass and I.D. to a TSA officer, would pass constitutional muster. Changes in technology or gains in knowledge as to terrorist operations may prompt the TSA or its successors to claim the need for recognition of danger at an earlier point in the boarding process. However, such a claim, and whatever legal issues it might raise, are not now before us.

wand passed over Aukai's front right pants pocket, TSA Officer Misajon did not reach into Aukai's pocket or feel the outside of Aukai's pocket. Rather, Misajon asked Aukai if he had something in his pocket. When Aukai denied that there was anything in his pocket, Misajon repeated the wanding procedure. Only after the wand alarm again sounded and Aukai again denied having anything in his pocket did Misajon employ a more intrusive search procedure by feeling the outside of Aukai's pocket and determining that there was something in there.

At that point, TSA Supervisor Vizcarra became involved. Vizcarra asked Misajon to pass the wand over Aukai's pocket again. When the wand alarm again sounded, Vizcarra directed Aukai to empty his pocket. Aukai again protested that he had nothing in his pocket. Using the back of his hand, Vizcarra touched the outside of Aukai's pocket and felt something inside. Vizcarra again directed Aukai to empty his pocket. This time Aukai reached into his pocket and removed either his keys or change, but a bulge was still visible in his pocket. Vizcarra directed Aukai to remove all contents from his pocket. After first claiming there was nothing more, Aukai removed an object wrapped in some form of tissue paper and placed it on a tray in front of him. Suspecting that the item might be a weapon, Vizcarra unwrapped the item, discovering drug paraphernalia.

Like the Third Circuit, we find these search procedures to be minimally intrusive. *See Hartwell,* 436 F.3d at 180 (holding similar search procedures to be "minimally intrusive," explaining that the procedures are "well-tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search").

[9] The duration of the detention associated with this airport screening search was also reasonable. Witnesses testified that Aukai entered the checkpoint area at approximately 9:00

UNITED STATES v. AUKAI

a.m. and that the entire search at issue—starting from when Aukai walked through the checkpoint until the TSA's efforts to rule out the presence of a weapon resulted in the discovery of drug paraphernalia—took no more than 18 minutes. Although longer than detentions approved in other cases, *see, e.g., Sitz*, 496 U.S. at 448 (average delay of 25 seconds); *United States v. Martinez-Fuerte*, 428 U.S. 543, 546-47 (1976) (average detention of 3-5 minutes), the length of Aukai's detention was reasonable, especially in light of Aukai's conduct, because it was not prolonged beyond the time reasonably required to rule out the presence of weapons or explosives.[10] *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (stating that a seizure can become unlawful if it is "prolonged beyond the time reasonably required to complete [its] mission").

[10] Accordingly, we hold that the airport screening search of Aukai was a constitutionally reasonable administrative search.

**AFFIRMED.**

---

GRABER, Circuit Judge, with whom HAWKINS and WARDLAW, Circuit Judges, join, specially concurring:

I concur in the result and nearly all of the reasoning in the majority opinion. I write separately, however, because I cannot join the majority's irrelevant and distracting references to 9/11 and terrorists. Daniel Aukai is no terrorist and yet, whether in 1997 or 2007, the search that law enforcement personnel conducted of his person falls squarely within the confines of a reasonable administrative search.

---

[10]We note that the detention in this case was prolonged, not by delay on the part of the TSA officers conducting the screening, but by Aukai's repeated lies as to the contents of his pocket.

The majority holds, and I agree, that once a passenger enters the secured area of an airport, the constitutionality of a screening search does not depend on consent. That legal conclusion rests firmly on Supreme Court precedent and on the government's interest in ensuring the safety of passengers, airline personnel, and the general public. For decades, nefarious individuals have tried to use commercial aircraft to further a personal or political agenda at the expense of those on board and on the ground.[1] And the threat continues to exist that individuals, whether members of an organized group or not, may attempt to do the same. In my view, references to a "post-9/11 world," maj. op. at 9657, do not advance the analysis. Nor is there any legal significance to whether or not an individual is a terrorist. *See* maj. op. at 9657-59. By relying on those factors, the majority unnecessarily makes its solid holding dependent on the existence of the current terrorist threat, inviting future litigants to retest the viability of that holding.

[1]*See, e.g., 4 Cuban Gunmen Hijack Airliner,* N.Y. Times, Apr. 17, 1959, at 1 (reporting the hijacking of a Cuban domestic airliner by four individuals, who forced the pilot to fly them to Miami, Florida); *Youth Tries to Hijack Jetliner,* N.Y. Times, Nov. 18, 1965, at 1 (discussing an attempt by a 16-year-old to hijack a National Airlines flight, during which he attempted to shoot an aide to the federal space program); *Gunman Is Foiled in Jet Hijacking,* N.Y. Times, July 13, 1968, at 1 (recounting an attempt by a lone gunman to hijack a Delta Air Lines flight from Philadelphia, Pennsylvania, to fly to Cuba); *Arabs Hijack a Dutch Jet, With 288 Aboard, to Libya,* N.Y. Times, Nov. 26, 1973, at 1 (covering the hijacking of a KLM Air Lines flight over the Middle East); *2 Hijack Soviet Jet, Force It to Finland,* N.Y. Times, July 11, 1977, at 1 (noting the hijacking of a Soviet airliner by two armed gunmen, who forced the plane to land in Helsinki, Finland); *German Jet Forced to Fly to Istanbul,* N.Y. Times, Mar. 27, 1985, at A11 (reporting the hijacking by a lone gunman of a Lufthansa flight from West Germany); Craig R. Whitney, *The Crash of Flight 103,* N.Y. Times, Dec. 23, 1988, at A1 (discussing the explosion of Pan Am flight 103 over Lockerbie, Scotland); *4 Injured as Crew on Cargo Jet Fights Off Attempted Hijacking,* N.Y. Times, Apr. 7, 1994, at A12 (describing the attempted hijacking of a Federal Express airplane by a disgruntled employee).

```
                                                        MOATT    INVATT
                                                        33       ENBANC
                                                                     i
```

INTERNAL USE ONLY: Proceedings include all events.
04-10226 USA v. Aukai

UNITED STATES OF AMERICA            Thomas J. Brady, Esq.
      Plaintiff - Appellee         FAX 808/541-2958
                                    808/541-2850
                                    Suite 6-100
                                    [COR LD NTC aus]
                                    Loretta A. Sheehan, Esq.
                                    FAX 808/541-2958
                                    808/541-2850
                                    Suite 6-100
                                    [COR LD NTC aus]
                                    USH - OFFICE OF THE U.S.
                                    ATTORNEY
                                    PJKK Federal Building
                                    300 Ala Moana Blvd.
                                    P.O. Box 50183
                                    Honolulu, HI 96850

                                    John A. Drennan, Esq.
                                    FAX 202/305-2121
                                    202/514-3622
                                    Ste. 1706
                                    [COR LD NTC gov]
                                    DOJ - U.S. DEPARTMENT OF
                                    JUSTICE
                                    Civil Division/Appellate Staff
                                    950 Pennsylvania Ave., NW
                                    Washington, DC 20530

      v.

DANIEL KUUALOHA AUKAI               Pamela O'Leary Tower, Esq.
      Defendant - Appellant        FAX 808/533-4588
                                    808/526-9500
                                    1330 Pacific Tower
                                    [COR LD NTC cja]
                                    1001 Bishop Street
                                    Honolulu, HI 96813